# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

Assigned on Briefs March 26, 2013

## JOHN LOWERY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 98047     Bob R. McGee, Judge**

**No. E2012-01613-CCA-R3-PC - Filed September 4, 2013**

The petitioner, John Lowery, appeals the Knox County Criminal Court's summary dismissal of his petition for a writ of error coram nobis. He asserts that newly discovered evidence, namely two witnesses' recantation of their identification of the petitioner as the shooter and a previously unknown witness who said the petitioner was not at the scene of the crime, warranted a new trial on his convictions of premeditated first degree murder and attempted first degree murder. Upon review, we reverse the judgment of the coram nobis court and remand for an evidentiary hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Joseph A. Fanduzz, Knoxville, Tennessee (on appeal), Charles A. Murray, Bonita Springs, Florida (at trial), and Russell T. Greene, Knoxville, Tennessee (at trial), for the appellee, John Lowery.

Robert E. Cooper, Jr., Attorney General and Reporter; and David H. Findley, Senior Counsel, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reveals that on May 6, 1998, a Knox County Criminal Court Jury found the petitioner guilty of premeditated first degree murder and attempted first degree murder. The petitioner received consecutive sentences of life and twenty-five years, respectively. On

direct appeal, this court summarized the proof adduced at trial as follows:

At approximately 6:40 a.m. on October 8, 1996, William Boatwright and his cousin, Vincent Hartsell, went to Kirk's Market in Knoxville to purchase food items. Boatwright went inside the market, while Hartsell remained in the car. After Boatwright made his purchase, he walked outside, and Jay Harris, who was standing outside, called him to the side of the building so that they could converse. After Boatwright spoke with Harris for a few seconds, he heard a gunshot. When he turned around, he saw the [petitioner] running towards him carrying a handgun. As Boatwright attempted to reenter the store, the [petitioner] shot him in the chest. Boatwright went inside the store and crawled behind the counter, and the [petitioner] went inside after him, firing his gun. However, because the store employee began screaming, the [petitioner] fled the scene. Boatwright remained in the store for several minutes and then went outside to check on Hartsell, who had been shot in the neck while waiting in the car.

Malik Hardin, a friend of Boatwright and Hartsell, witnessed the shooting while sitting in his car in the Kirk's Market parking lot. Boatwright got into Hardin's car and drove to a relative's home, while Hardin stayed with Hartsell until the police arrived.

Boatwright was subsequently transported to the hospital, where he told the police that "J.B." shot Hartsell and him. The police compiled a photographic lineup, and Boatwright identified the [petitioner] as the shooter. Hardin also viewed the photographic lineup and identified the [petitioner] as the man who shot Boatwright and Hartsell.

The next day, Hartsell, who was sixteen (16) years of age, died as a result of a gunshot wound to the neck.

Investigating officers recovered a .45 caliber bullet behind the counter in the store as well as a .45 caliber shell casing in front of the store counter. The police also discovered a bullet hole in the counter. Another .45 caliber bullet casing

-2-

was found in the car where Hartsell was shot, and officers found an "eight ball" of crack cocaine by the right passenger door. Don Carman, a TBI forensic firearms examiner, examined the bullet casings and determined that the casing found in the store and the casing found in the car were fired from the same weapon.

James Bowman, a friend of [the petitioner's] family, gave a statement to police officers shortly after the incident. In his statement, Bowman told officers that, just prior to the shooting, he brought his stepdaughter to Kirk's Market so that she could purchase a drink before school. While his stepdaughter was inside the market, the [petitioner] got into Bowman's car and began telling Bowman that he had been robbed earlier that morning. Suddenly, a car pulled beside them, and the [petitioner] told Bowman that the men who robbed him were in the car. The [petitioner] then got out of the car and told his brother, Fred Lowery, and his cousin, Jay Harris, "[t]hat's it, boys, right here." When the [petitioner], Fred Lowery and Harris surrounded the building, Bowman left with his stepdaughter. Bowman dropped his stepdaughter off at school, and when he drove past Kirk's Market on his way home, Boatwright and Hartsell had been shot.

The state also presented the testimony of Mary Santos, who had previously been romantically involved with the [petitioner's] uncle, Walter Lowery. Santos testified that Walter hired the [petitioner] and the victim, Vincent Hartsell, to sell drugs for him. She stated that in late Spring or early Summer 1996, the [petitioner] and Walter were angry with Hartsell over a botched drug sale. Santos testified that, on several occasions, the [petitioner] stated that he would kill Hartsell in retaliation.

The [petitioner] presented an alibi defense at trial. Fred Lowery, Jay Harris and Greg Moore testified that they were at Kirk's Market during the shooting on October 8. None of these witnesses saw the person who shot Boatwright and Hartsell, but all testified that the [petitioner] was not present during the shooting. In addition, Tamera McMillan, the [petitioner's] neighbor, testified that the [petitioner] was at her home during

-3-

the time of the shooting.

State v. John Bradley Lowery, No. E1998-00034-CCA-R3-CD, 2000 WL 748103, at *1-2 (Tenn. Crim. App. at Knoxville, June 12, 2000) (footnotes omitted). This court affirmed the petitioner's convictions and sentences. Id. at *1. On August 23, 2000, the petitioner filed a Rule 11 application for permission to appeal to the supreme court, which was denied on February 20, 2001.

More than a decade later, on September 14, 2011, the petitioner filed a petition for a writ of error coram nobis and an accompanying memorandum of law in support of the petition. He asserted that on September 16, 2010, Hardin signed a sworn affidavit in which he "admitted that he did not believe he was making a correct identification, and only made the identification at the time because he feared police action and the officer pointed to the Petitioner's photograph in the photo[graphic] array." The petitioner maintained that the photographic array used by police was unduly suggestive and that the identification was the result of coercive police action. The petitioner also asserted that the State had violated Brady v. Maryland, 373 U.S. 83, 87 (1963), by failing to reveal an exculpatory statement by a witness, Loretta Turner. In support, the petitioner asserted that on August 17, 2011, Turner executed a sworn affidavit, saying that she

> was present at the time of the shooting. She was interviewed by police and was asked if the Petitioner was in the store at the time of the shooting. Turner indicated that the Petitioner was not present to the officer, but was not contacted further. Turner's statement was never provided to the defense despite representing exculpatory evidence which was requested [on] August 15, 1997. In addition, she was never contacted by defense counsel and was unaware that there had been a trial until well after the Petitioner was convicted.

The petitioner asserted that if his trial counsel "had conducted proper interviews of the witnesses, he would have discovered that Turner was present and that she would have testified that the Petitioner was not at the store at all that day."[1] The petitioner maintained that the foregoing two witnesses had provided newly discovered evidence establishing the petitioner's actual innocence and warranting the issuance of a writ of error coram nobis. The State did not file a response to the petition.

---

[1]A claim of ineffective assistance of counsel is not an appropriate ground for relief pursuant to a writ of error coram nobis. See Daniel Lee Draper v. State, No. E2009-00952-CCA-R3-PC, 2010 WL 5343193, at *5 (Tenn. Crim. App. at Knoxville, Dec. 21, 2010).

On May 22, 2012, the petitioner filed an amended petition for a writ of error coram nobis and an amended memorandum of law in support of the motion. He said that in addition to the affidavits sworn to by Hardin and Turner, he had "recently made contact" with Boatwright, who signed an affidavit on April 5, 2012, "stating that the incriminating testimony he provided at [the petitioner's] trial was false and that he was forced to provide that testimony by the investigating police officers, leading to the conviction of an innocent man." The petitioner attached Boatwright's affidavit to his amended petition. The petitioner said that Boatwright had "called the Petitioner by name in his identification despite having never known him and admitted that he had discussed the Petitioner's identity with someone before the identification before eventually recanting his testimony." The State filed no response to the amended petitions.

On June 27, 2012, the coram nobis court filed an order, dismissing the petition. The court noted that the petitioner had supplied two affidavits as newly discovered evidence. The court noted that Hardin's affidavit was dated twelve years after the trial. The court found that it was not newly discovered evidence because Hardin "does not completely recant his testimony, he was available for cross examination, and the certainty and reliability of his identification testimony were certainly available for petitioner to attack." The trial court also stated that Turner's affidavit, which was dated thirteen years after the trial, did not contain newly discovered evidence. The court explained, "Neither her affidavit nor the petition establish why petitioner could not have known this person was at the scene of the crime and therefore a potential witness. A general Brady motion does not relieve a defendant of the duty to diligently investigate a case." The court stated:

> Petitioner fails to show that the introduction of the contents of the affidavits into evidence would have produced a different result at trial. Witness Bowman testified that before the shooting the petitioner told him that he, the petitioner, had spotted the men who robbed him. Victim Boatwright identified petitioner as the perpetrator and the certainty and reliability of his identification were available for attack by the defense. Petitioner introduced other witnesses to present the defense of alibi. The jury did not believe his witnesses and did believe the state's witnesses.

> Petitioner seeks to bolster his argument by complaining of ineffective assistance of counsel. The effectiveness of trial counsel is not newly discovered evidence.

On appeal, the petitioner challenges the coram nobis court's summary dismissal of his

petition.

## II. Analysis

Tennessee Code Annotated section 40-26-105 provides:

> There is hereby made available to convicted defendants in
> criminal cases a proceeding in the nature of a writ of error
> coram nobis, to be governed by the same rules and procedure
> applicable to the writ of error coram nobis in civil cases, except
> insofar as inconsistent herewith. . . . Upon a showing by the
> defendant that the defendant was without fault in failing to
> present certain evidence at the proper time, a writ of error coram
> nobis will lie for subsequently or newly discovered evidence
> relating to matters which were litigated at the trial if the judge
> determines that such evidence may have resulted in a different
> judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

Initially, we note that on appeal, the State asserts that the petitioner's claim was barred by the statute of limitations. The record reveals that the petitioner's petition for a writ of error coram nobis was filed well-outside the one-year statute of limitations. Tenn. Code Ann. § 27-7-103. However, the State did not file a response to the petition and therefore did not raise the untimeliness of the petition as an affirmative defense in the lower court. See Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003) (stating that "the State bears the burden of raising the bar of the statute of limitations as an affirmative defense"). Additionally, the coram nobis court did not deny the petition on this basis. Therefore, we will not affirm the dismissal of the petition due to untimeliness.

The writ of error coram nobis, now codified in Tennessee Code Annotated section 40-26-105, is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered
> evidence and be "reasonably well satisfied" with its veracity. If
> the defendant is "without fault" in the sense that the exercise of
> reasonable diligence would not have led to a timely discovery of
> the new information, the trial judge must then consider both the
> evidence at trial and that offered at the coram nobis proceeding
> in order to determine whether the new evidence *may have* led to
> a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

The petitioner's petition for coram nobis relief is based on claims of recanted testimony and a newly discovered witness. Recanted testimony may be considered newly discovered evidence under certain circumstances. See Mixon, 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony
> given by the material witness was false and the new testimony
> is true; (2) the defendant was reasonably diligent in discovering
> the new evidence, or was surprised by the false testimony, or
> was unable to know of the falsity of the testimony until after the
> trial; and (3) the jury *might have* reached a different conclusion
> had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (emphasis added) (citing Mixon, 983 S.W.2d at 673 n.17).

The coram nobis court found that "Petitioner fails to show that the introduction of the contents of the affidavits into evidence *would have* produced a different result at trial." As we have noted, the proper standard to be applied is whether the jury "may have" reached a different result. This court has previously stated, "While this appears at first glance to be a matter of mere semantics, the difference in the analysis of the situation under a 'would have' standard is definitively more burdensome for a coram nobis petitioner than would be the case under a 'may have' standard." Margo Freshwater v. State, No. W2006-01758-CCA-OT-CO,

2008 WL 4560242, at *9 (Tenn. Crim. App. at Jackson, Oct. 8, 2008). Therefore, requiring a petitioner to show that the new evidence *would have* resulted in a different verdict is not the correct standard to use in denying coram nobis relief. See Johnson v. State, 370 S.W.3d 394, 698-99 (Tenn. 2011); Vasques, 221 S.W.3d at 527-28. Accordingly, we must conclude that the trial court applied the wrong standard when dismissing the petition.

Moreover, the coram nobis court dismissed the petition without a hearing. Our supreme court has previously cautioned that "[c]oram nobis claims . . . are singularly fact-intensive [allegations that] are not easily resolved on the face of the petition and often require a hearing." Harris v. State, 102 S.W.3d 587, 592 -93 (Tenn. 2003). "However, a petitioner is not automatically entitled to an evidentiary hearing by simply filing a petition for writ of error coram nobis. Instead, the petition must demonstrate that the petitioner is entitled to the extraordinary relief that the writ provides." Phedrek Davis v. State, No. M2011-01366-CCA-R3-CO, 2012 WL 3017806, at *3 (Tenn. Crim. App. at Nashville, July 23, 2012) (internal quotations and citations omitted). Leaving to the coram nobis court to decide whether the petitioner is entitled to the issuance of a writ of error coram nobis, we conclude that the petitioner nevertheless made a sufficient threshold showing of newly discovered evidence to warrant a hearing.

### III.  Conclusion

In sum, we conclude that the coram nobis court erred by summarily dismissing the petition and by applying the wrong standard. Accordingly, we reverse the judgment of the court and remand for an evidentiary hearing.

_____
NORMA McGEE OGLE, JUDGE

-8-